# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| DRESSER-RAND COMPANY, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-12-184 |
| | § | |
| SCHUTTE & KOERTING ACQUISITION | § | |
| COMPANY, *et al.* | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION

The following constitutes the memorandum opinion in support of the court's order of January 30, 2012, granting in part plaintiff Dresser-Rand's motion for preliminary injunction. *See* Dkt. 9.

## PROCEDURAL BACKGROUND

On January 19, 2012, Dresser-Rand filed an *ex parte* application for a temporary restraining order, which the court granted. Dkt. 3. The court held an oral hearing on January 26 and 27, 2012 to determine if a preliminary injunction would be proper. After taking evidence and hearing the arguments of the parties, the court determined that some injunctive relief was appropriate and issued a preliminary injunction, ordering individual defendants Kanaksinh Ashar and Anthony Jardine to return all Dresser-Rand materials and to refrain from using any Dresser-Rand trade secrets going forward. Additionally, the court ordered S&K to remove the allegedly infringing brochure from its website pending an outcome on the merits. Now the court issues its memorandum opinion in support of its injunction.

## FACTUAL BACKGROUND

Based on the evidence in the record and the testimony of the witnesses, the court finds the following.

A.      **The Gimpel Oil Operated Inverted Trip ThrottleValve**

The technology at issue in this trade secrets case surrounds the Gimpel Oil Operated Inverted Trip Throttle Valve ("Gimpel Valve" or "Gimpel OOTTV").

1.      **The Gimpel Corporation**

The Gimpel Corporation was founded in 1919 and began developing trip and throttle valves in the 1940's for the Navy.  Later, in the 1970's and 1980's, Gimpel became one of the leading companies in the valve market with the introduction of the Gimpel OOTTV.  Gimpel was located about 6 miles away from its competitor, Schutte & Koerting ("S&K").[1]  According to S&K's current President, Michael Pintozzi, until the 1940's Gimpel was a machine shop.  But in the 1940's an S&K engineer named Keller left S&K with drawings, went to Gimpel, and helped Gimpel design its own OOTTV.

An OOTTV is a specialty valve used in the oil and gas and electric power generation industry.  The OOTTV is a safety valve used on turbines and operates by shutting down the turbine in case of the occurrence of one of many types of safety conditions.  The valves vary in size from a few feet long to as much as eight feet long.  They are expensive, fetching between 70,000 and 500,000 dollars apiece.  Gimpel has a premier reputation in the field of OOTTV's.

2.      **Tyco**

In the 1990's, Tyco bought Gimpel and the Gimpel valve technology.  There is no evidence in the record regarding the lengths to which Tyco went to protect the Gimpel Valve technology.  However, there was testimony that Tyco would likely comply with industry standards for a sophisticated company and protect its trade secrets.

---

[1] The current incarnation of S&K is Schutte & Koerting Acquisition Company.  The other S&K entities named as defendants no longer exist.

### 3.      Dresser-Rand Company

In 2007, Dresser-Rand acquired the Gimpel Valve assets from Tyco.  In November 2009, Dan Levin joined the Gimpel Valve strategic business unit of Dresser-Rand as the General Manager. He had been at Dresser-Rand since February 2008.  He testified at the oral hearing.

Kanaksinh Ashar was the principal engineer for the Gimpel Valve unit at Dresser-Rand.  He oversaw all aspects of filling orders for valves.  He would, as part of his job, oversee the engineering of each valve, including redesigning the valves to suit each customer's needs.  Ashar signed an Employment Agreement Relating to Intellectual Property ("Agreement") with Dresser-Rand.  In relevant part, the Agreements reads:

> During my employment and thereafter, I shall keep secret and confidential and not disclose to any unauthorized person, any secret or confidential information of the COMPANY that I obtain as a result of my employment.
>
> I shall return to the COMPANY on the termination of my employment or on request by the COMPANY all documents and materials belonging to the COMPANY.

*See* Ex. 4 from Oral Hearing.

Anthony Jardine was a product specialist overseeing the draftsmen and designers with regard to making sure the specifications were correct in the drawings that then went to the shop.   Although he was present at the hearing, no party called him to testify.  He signed the same Agreement. Additionally, all Dresser-Rand employees are required to complete training on the code of conduct—including maintaining the confidentiality of Dresser-Rand materials—on an annual basis.

In November 2009, Ashar told Levin that he wanted to move towards retirement with a goal of retiring in March 2010.  Although there was some discussion about the possibility of Ashar signing a consulting agreement with Dresser-Rand, that never came to fruition.  In January 2011, upon learning that Ashar was leaving Dresser-Rand to work for S&K, Levin had a discussion with

Ashar in which he reminded Ashar of his obligations under the code of conduct and the Agreement Ashar had signed with Dresser-Rand.  Levin also asked Ashar if he wanted "to be the guy that leaves us to go to a competitor, to take our knowledge to the competitor."  Ashar assured Levin that was not the reason he was hired by S&K and that any hint of that type of expectation would cause him to leave S&K.  Levin also, pursuant to Dresser-Rand policy, terminated Ashar's employment immediately, demanding the return of all Dresser-Rand materials, and discontinuing all of Ashar's access to the Gimpel Valve unit, including the Gimpel Valve servers discussed more fully later.

After Ashar left, Levin spoke with Jardine to determine whether Jardine would being staying at Dresser-Rand.  Jardine said that he would stay.  However, one month later Jardine gave two weeks notice of his own departure.  He was allowed to work out the two weeks with continued full access to the Gimpel Valve unit.

In August 2011, Levin became aware that S&K had a brochure on its website for an S&K OOTTV that appeared be essentially identical to the Gimpel Valve.  Levin offered his opinion at the hearing that S&K could not have reverse engineered the Gimpel Valve to produce its own OOTTV. Levin has an undergraduate degree in business and a two-year technical degree in electronics technology.  He is not an engineer, but has worked in the valve industry for over 30 years, supervising engineers that designed valves.  Levin admitted that someone could copy a single valve. But, he also opined that simply copying a single valve would not suffice because of the significant variances in individual valves due to customer needs.

After determining that the brochures were likely identical, Levin then contacted the Dresser-Rand legal department.  The legal department and Levin undertook to examine Ashar and Jardine's hard drives, based on images taken of those drives when both men left the company.  The investigation revealed that Ashar had downloaded a significant number of files in December 2010.

4

The files contained a spectrum of documents, among which were the manufacturing drawings, bills of material, calculations, test data, and engineering specifications for the Gimpel Valve. Levin testified that in the normal course of business, employees access these documents on one of the Gimpel Valve servers, called Team Center, reserved for these types of materials. It would be unusual for an employee to copy the file to another drive. An examination of Jardine's drive demonstrated that he downloaded ASME standards[2] and ANSI standards,[3] which are publically available for purchase by subscription.

Dresser-Rand goes to great lengths to protect all of its materials. The Gimpel Valve unit is not accessible by employees not working on the valve. The computers and servers are password protected and have confidentiality notices that display every time an employee logs on to their computer. The drawings and other technical information are kept on a special server called Team Center. Not all Gimpel Valve unit employees have access to Team Center. Levin does not have access to Team Center. Team Center contains both historical and recent technical materials regarding the Gimpel Valve. Nothing prevents employees from saving non-technical materials to Team Center. But, most employees save non-technical documents to other Gimpel Valve servers.

Documents in Team Center do not necessarily have a stamp designating them as confidential. Those designations are affixed when the materials are taken outside to a supplier under a confidentiality agreement. The materials do generally have a mark with the name Gimpel, Tyco, or Dresser-Rand, indicating ownership. The compilation of materials, whether created by Gimpel,

---

[2] The American Society of Mechanical Engineers publishes standards—a set of technical definitions and guidelines that function as instructions for designers, manufacturers, operators, or users of equipment—for use in various technical fields.

[3] The American National Standards Institute is a private non-profit organization that oversees the development of voluntary consensus standards for products, services, processes, systems, and personnel in the United States.

5

Tyco, or recently by Dresser-Rand have a value greater than the sum of the individual documents because they are compiled in one place.

Levin testified that Dresser-Rand lost a bid on two OOTTV's to S&K.  He further testified that he had not seen the S&K OOTTV or any drawings of the valve other than the brochure on the S&K website and agreed that he therefore had no basis to assert that any specific confidential material was used in the design of the S&K OOTTV.

## B.   The S&K Oil Operated Inverted Trip Throttle Valve

The firm of Schutte & Koerting was founded in 1876.  During the 1920's through 1940's, S&K was a leading manufacturer of valves and other custom design engineered equipment for the process power industry.  S&K first patented an oil operated valve in 1926.  The basic process of the OOTTV is the same now as in 1926, although there have been  many innovations to meet customer needs and industry standards.  S&K has never stopped manufacturing throttle trip valves.

The Gimpel Valve and the S&K valve look similar because they have the same origins. Additionally, over the years engineers and machinists would move back and forth between Gimpel and S&K, causing a great deal of cross-over and similarity in design.  S&K adduced a drawing of an S&K design for an OOTTV that was active in the 1970's.  It has many similarities to the present-day Gimpel valve.

In the 1970's, the corporation that had purchased S&K determined that profit margins were not good enough for S&K to continue to chase after new OOTTV customers.  Instead S&K focused on other valves and equipment, but continued servicing its already existing OOTTV customers. However, as part of servicing its customers for other products, S&K was up to date on any changes to the Gimpel Valve.  Since Gimpel was pretty much the only game in town, S&K's customers would, from time to time, discuss whether S&K could begin to manufacture the valves again.

Pintozzi has had the opportunity to examine the Gimpel Valve in the field.  Customers sometimes cannot tell which valve they have, so Pintozzi will look at the valve and identify it as either an old S&K valve or a Gimpel Valve.  He has also been at new installations of the Gimpel Valve Additionally, S&K would collect literature about their competitors' products, including the Gimpel Valve, in order to be knowledgeable about the market.

In 1992, S&K explored the possibility of becoming an alternate supplier of new OOTTV's.  Although there was some interest, S&K ultimately determined that the interest was not sufficient to make reentering the market feasible.  However, in 2007, Elliot Corporation, a competitor of Dresser-Rand's, told Pintozzi that Dresser-Rand had purchased Gimpel.  Elliot Corporation had also tried to purchase Gimpel but lost the bid to Dresser-Rand.

Elliot did not want to purchase valves from Dresser-Rand, with whom it had some animosity due to Dresser-Rand allegedly undercutting Elliot on a job using Elliot's own specifications without permission.  Elliot approached S&K about whether S&K could manufacture top mechanical throttle trip valves and OOTTV's.  S&K began manufacturing and supplying Elliot with top mechanical trip throttle valves in 2007.  As word got out that S&K was once again manufacturing top mechanical valves, many customers contacted S&K and ordered top mechanical valves as well.

In January of 2010, S&K advised Elliot that it was going to begin to bring people on board to develop an OOTTV that would meet Elliot's specifications and industry standards.  S&K had an engineer that they intended to use for the job, but in the summer of 2010, he left to pursue teaching.  So, S&K began its search.  Among the things it did to find an engineer was to advertise on Monster.com.  And, in October 2010, Pintozzi received an email from Ashar inquiring about the job.  Pintozzi knew Ashar from when he worked for Gimpel.  During the period when Tyco moved to Texas, S&K had actually used Ashar as a consultant to do some designs and some service in the field

7

on S&K's throttle trip valves.  Recognizing that Ashar was one of the leading engineers for throttle trip valves, S&K offered Ashar the job.

Ashar began work at S&K on its OOTTV on January 31, 2011.  He is currently the manager of engineering to update S&K's valve.  Although he had all of the materials he downloaded from Dresser-Rand on several flash drives, he never uploaded those files to the S&K computer or server.  Ashar testified that the only time he used the data taken from Dresser-Rand in his work at S&K is when he checked the final design.  If he had a question about something and needed a reference, he would open the files and check the reference.  Jardine did not testify, and there is no evidence in the record that he ever did anything with the files he took from Dresser-Rand.

Pintozzi testified that he had no idea that Ashar had any materials from Dresser-Rand.  He never asked Ashar whether he had those types of materials.  Pintozzi mainly spoke to Ashar about whether Ashar was capable of taking the valves that S&K already had in house and upgrading them to the current standards.  Pintozzi assumed that by hiring Ashar and Jardine with their wealth of experience, he had hired two men who could design the valve in their sleep.

Pintozzi further testified that he did not hire Ashar or Jardine for the purpose of getting Dresser-Rand's confidential materials or trade secrets.  The first that Pintozzi knew of the problem or the existence of the materials was when he was served with this law suit.  Moreover, Pintozzi testified that the Gimpel Valve and S&K's OOTTV are not identical.  One section of the S&K OOTTV is taken from the S&K valves that S&K has been providing for years and from the valve that it has supplied to Elliot.  There are similarities between the two valves, but that is a function of the government regulations, industry standards, and customer expectations.

In May or June of 2011, a secretary at S&K put together an online brochure for S&K's OOTTV.  Elliot had requested that S&K provide literature online for its sales force.  Pintozzi gave

the task to a secretary and gave her the Gimpel Valve brochure as a template.  He looked at the final

S&K brochure when it went on line and noted the similarities, but didn't do an in-depth comparison.

The brochure was not a priority because S&K was not really ready to go to market with its OOTTV

yet.  Pintozzi testified that he has taken the brochure off of the website.  But, he could not estimate

how many people might have seen the brochure while it was posted.

ANALYSIS

A party seeking a temporary restraining order or other injunction pursuant to Rule 65 of the

Federal Rules of Civil Procedure has the burden to demonstrate each of four elements: (1) a

substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the

injunction is denied; (3) that the threatened injury outweighs any prejudice the injunction might

cause the defendant; and (4) that the injunction will not disserve the public interest.  *Janvey v.

Alguire*, 628 F.3d 164, 174 (5th Cir. 2010);  *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*,

577 F.3d 250, 252-53 (5th Cir. 2009); *Affiliated Prof' l Home Health Care Agency v. Shalala*, 164

F.3d 282, 285 (5th Cir. 1999).  Injunctive relief, particularly at the preliminary stages of litigation,

is an extraordinary remedy that requires an unequivocal showing of the need for the relief to issue.

*Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997).  Thus, injunctive relief

should only be granted where the movant has "clearly carried the burden of persuasion."  *Bluefield

Water Ass'n*, 577 F.3d at 253; *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009).

**A.**     **Likelihood of Success on the Merits**

Dresser-Rand seeks injunctive relief based on four of its claims against defendants.  The

court reviews each in turn.

**1.**     **Breach of Confidentiality Agreements**

Dresser-Rand claims that Ashar and Jardine breached their Employment Agreements

9

Relating to Intellectual Property ("Agreement") when they copied files from Team Center and allegedly used the materials to help design S&K's OOTTV.  "A party claiming breach of contract has the burden to prove the elements of that cause of action, which include (1) the existence of a valid contract between the plaintiff and defendant, (2) the plaintiff performed, (3) the defendant breached the contract, and (4) the plaintiff was damaged as a result of the breach."  *Calce v. Dorado Exploration, Inc.*, 309 S.W.3d 719, 733–34 (Tex.App.–Dallas 2010, no pet.).  There seems to be no dispute regarding the first three elements.  Ashar testified that in spite of the fact that he signed the Agreement, he did not return any files to Dresser-Rand when he terminated his employment, thereby violating his Agreement.  Notably, the Agreement does not specify that employees must return only confidential files upon leaving the company, but that the employee "shall return . . . *all documents* and materials belonging to the company."  Dkt. 1, Exs. E, F (emphasis added).  Although Jardine did not testify at the hearing, evidence in the record demonstrates that he too downloaded documents from Dresser-Rand's servers in violation of his signed Agreement before terminating his employment.  Therefore, Dresser-Rand met its burden to demonstrate the first three elements.

The last prong is slightly more difficult.  In Texas, the measure of "damages for the breach of contract is just compensation for the loss or damage actually sustained."  *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 278 (5th Cir. 2009).  Clearly Dresser-Rand is damaged by the continuing possession of its files by Ashar and Jardine.  Even assuming for the sake of argument that the files they removed did not contain trade secrets, Ashar and Jardine were required by the plain terms of their Agreements to return those materials.  Additionally, although as discussed below, Dresser-Rand has not shown that Ashar and Jardine actually used trade secrets when engineering S&K's valve, any future use of trade secrets would cause harm to Dresser-Rand.  Ashar and Jardine have agreed to return the materials and refrain from using them.  Since Texas law favors limiting the preliminary

injunction to the agreement of the parties, the court's preliminary injunction on this subject is limited to the possession and future use of the materials.  *See Anadarko Petr'l. Corp. v. Davis*, No. H-06-2849, 2006 WL 3837518, at *22–24 (S.D. Tex. Dec. 28, 2006) (Rosenthal, J.) (collecting cases).

### 2.    Misappropriation of Trade Secrets

Next Dresser-Rand argues that injunctive relief is appropriate based on its claim that Ashar, Jardine, and S&K misappropriated Dresser-Rand's trade secrets.  Dresser-Rand asks the court to enjoin Ashar and Jardine from using Dresser-Rand's trade secrets and to enjoin S&K from any further development on the OOTTV.  In order to succeed on the merits, Dresser-Rand bears the burden to show "(1) existence of a trade secret, (2) breach of a confidential relationship or improper discovery of a trade secret, (3) use of the trade secret, and (4) damages."  *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 332 S.W.3d 1, 14 (Tex.App.–Fort Worth 2010, pet.filed).  The threshold inquiry here is whether Dresser-Rand has demonstrated that it has a trade secret.

#### a.    Existence of a Trade Secret

The Fifth Circuit has commented that a trade secret "is one of the most elusive and difficult concepts in the law to define."  *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978).  In Texas, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it."  *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (internal quotation omitted).  The Texas Supreme Court has adopted the six factor test set forth in the Restatement of Torts[4] to determine whether a trade secret exists.  *Id.*  According to the Restatement, courts should weigh the following factors:

---

[4]  The factors were originally set forth in § 757 of the 1939 edition of the Restatement of Torts.  However, the factor are now located in the reporter's notes to § 39 of the Restatement (Third) of Unfair Competition.

      (1) the extent to which the information is known outside of his business;

      (2) the extent to which it is known by employees and others involved in his business;

      (3) the extent of the measures taken by him to guard the secrecy of the information;

      (4) the value of the information to him and to his competitors;

      (5) the amount of effort or money expended by him in developing the information;

      (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting Restatement (Third) of Unfair Competition § 39 reporter's n. cmt. d.) (formatting altered from original for clarity). These factors are not dispositive, and courts should consider the information in context, applying other relevant circumstances to the inquiry. *Id.* at 740. However, "a trade secret must be 'secret'." *Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir. 1983). "Thus, to qualify as a trade secret the information cannot be generally known by others in the same business nor readily ascertainable by an independent investigation." *Id.*

      Dresser-Rand argues that all of the materials in Team Center are strictly confidential and, thus, trade secrets. It goes to great lengths to limit access to those materials, requiring special permission to access the building and the Team Center server. Even Levin, the general manager of the Gimpel unit at Dresser-Rand, did not have access to Team Center. Although Dresser-Rand admits that much of the material was designed first by Gimpel and then by Tyco, Levin testified that at least some of the materials were produced by Dresser-Rand itself. Dresser-Rand argues that the Gimpel valve basically holds the entire market for OOTTV's, arguing that others have tried to design a competing valve and failed. The valves represent a significant investment of time and manpower by Dresser-Rand. And, the return on that investment is substantial; individual valve prices range from hundreds of thousands to millions of dollars. Moreover, the market for these valves is small enough that any significant competition could damage Dresser-Rand's almost exclusive hold. Levin also testified that reverse engineering the valve would be exceedingly difficult.

Defendants counter that the materials in Team Center are not trade secrets, or least are not all trade secrets. Dresser-Rand only acquired the business a short time ago. The Gimpel valve in its present form has not changed significantly over the years. And, Dresser-Rand adduced no evidence regarding the security measures taken to guard the secrets before it acquired Gimpel. To the contrary, Pintozzi testified and adduced some documents to suggest that drawings of the valve were sent out to customers and circulated among competitors with some regularity over the years. Additionally, Pintozzi—a mechanical engineer—testified that reverse engineering the valve would be easy. The S&K OOTTV, although out of date, was not so far off the current industry standards that S&K would need to reverse engineer the entire valve. S&K could easily have gotten a Gimpel valve to examine because Ellis, who owned many of the valves, was actively soliciting S&K's OOTTV development and would certainly have facilitated an examination. Defendants also solicited testimony from Levin that not all documents on the Gimpel unit servers were confidential. And considering how many documents Ashar took with him, there is no way to tell whether the materials he actually referenced while working for S&K were confidential.

The court finds that while not all materials on Team Center could be considered trade secrets, at least some of those materials would likely qualify for trade secret status—such as any documents created by Dresser-Rand since it acquired the Gimpel valve. It is an open question whether the historical documents qualify as trade secrets. Although Pintozzi testified that he could have reverse engineered the valve, he also testified that he did not. Even information that may be "capable of being obtained by observation, experimentation, inspection, analysis, or general inquiry. . . . can still be protected if the competitor gains it through a breach of confidence without the efforts of observation, experimentation, inspection, analysis or general inquiry." *Anderson Chem. Co.*, 66

13

S.W.3d at 442.  Therefore, the court concludes that at least part of the Team Center materials would qualify for trade secret protection at this stage of the proceedings.

        b.        *Breach of a Confidential Relationship/ Improper Discovery of a Trade Secret*

As discussed above, Ashar and Jardine breached their confidentiality agreements.  So, Dresser-Rand has carried its burden as to these defendants.  In order for Dresser-Rand to carry its burden as to S&K, it must show improper discovery of a trade secret.  "Improper means of acquiring another's trade secrets include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case." *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 636 (Tex.App.–Fort Worth 2007, pet. denied).  Dresser-Rand argues that S&K must have induced or at least participated in Ashar and Jardine's misappropriation because of the timing of Ashar and Jardine's departure and S&K's work on the valve.  However, Pintozzi testified that he had begun searching for a valve engineer and placed an ad on Monster to which Ashar replied.  Pintozzi knew he was getting a leading valve engineer with 30 years of experience on the Gimpel and other valves.  He testified that he assumed that Ashar and Jardine would be able to design a valve based on their extensive knowledge of valves.  Hiring an employee with experience is not, by itself, an improper means of acquiring trade secrets.  *See Anderson Chem. Co. v. Green*, 66 S.W.3d 434, 442 (Tex.App.–Amarillo 2001, no pet.) *abrogated on other grounds by Alex Sheshunoff Mgmt. Serv., L.P. v. Johnson*, 209 S.W.3d 644 (Tex. 2006).  Pintozzi testified that he had no idea that Ashar and Jardine had taken Dresser-Rand materials with them when they left.  Pintozzi never asked them if they had because it never occurred to him that they would.  The court finds that S&K did not use improper means to discover or acquire Dresser-Rand's trade secrets, based on Pintozzi's testimony that he had no knowledge of Ashar and Jardine's possession of Dresser-Rand

materials coupled with Ashar's testimony that he did not copy any Dresser-Rand files to the S&K servers.  Therefore, Dresser-Rand has failed to carry its burden to show that S&K gained trade secrets through improper means and that S&K thereby misappropriated trade secrets.

c.      *Use of the Trade Secret*

" 'Use' of a trade secret means commercial use, by which a person seeks to profit from the use of the secret." *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714, 720 (5th Cir. 2006) (quoting *Trilogy Software v. Callidus Software*, 143 S.W.3d 452, 463 (Tex.App.–Austin 2004, pet. denied)). "Any misappropriation of trade secrets, followed by an exercise of control and domination, is considered a commercial use." *Id.*  Dresser-Rand argues that S&K used its trade secrets in the design of the S&K OOTTV.  It points to the similarity in the S&K brochure as evidence.  Additionally, Levin testified that reverse engineering was not possible, so the very existence of the S&K OOTTV is proof that S&K used Dresser-Rand's trade secrets.  Moreover, Ashar testified that he referred to the Dresser-Rand materials when checking the final design.  The court is unpersuaded.

The similarities between Dresser-Rand's Gimpel valve brochure and S&K's OOTTV valve brochure are striking, and understandably led Dresser-Rand to pursue possible claims of misappropriation.  However, the brochures simply do not give enough detail to suffice as proof of misappropriation of the design of the valve itself.  Additionally, there is evidence in the record that these valves from the outside look very similar.  Over the years of cross-pollination between S&K and Gimpel engineers,  and based on the needs of the customers, the valves have developed a similar exterior look.  So, the brochure is not evidence of use of the trade secrets.

Dresser-Rand also argues that S&K could not have reverse engineered the valve.  However, the evidence in the record demonstrates that not only could S&K have reverse engineered the parts of the valve that needed to be updated, but that it was S&K's original plan to do so.  The only

15

witness competent to testify to the difficulty of the necessary reverse engineering was Pintozzi—a mechanical engineer. He testified that reverse engineering the valve would be easy and that he had originally intended to reverse engineer the modifications necessary to update S&K's OOTTV. Dresser-Rand proffered the testimony of Levin, Gimpel valve project's manager, who stated that reverse engineering would be difficult if not impossible. Levin, despite his years in the business, is not an engineer and cannot be considered an expert in that field. Accordingly, the court finds Pintozzi's testimony is more persuasive.

As for Ashar's reference to the materials while working at S&K, the evidence does not reveal whether he actually used trade secrets or confidential information. Certainly he used materials that he was not supposed to have taken with him. But, the record showed that he took a great many documents. Levin admitted that not every document on the Gimpel servers was confidential. Ashar had 30 years of valve engineering experience. And although Ashar may not use confidential information or trade secrets in his new employment, "a former employee may use the general knowledge, skill, and experience acquired during the employment relationship." *Anderson Chem. Co.*, 66 S.W.3d at 442. Therefore, Ashar's testimony that he looked at the data as a reference when checking the final design cannot by itself meet Dresser-Rand's burden at this stage. And, the record is completely devoid of evidence suggesting that Jardine actually used any of the materials he took from Dresser-Rand. Thus, Dresser-Rand has failed to meet its burden as to all defendants on its claim of misappropriation of trade secrets.

### 3.   Violations of the Texas Theft Liability Act

Dresser-Rand also claims that Ashar, Jardine, and S&K violated the Texas Theft Liability Act. Under the Act "[a] person who commits theft is liable for the damages resulting from the theft." Tex. Civ. Prac. & Rem. Code § 134.003(a). The Act defines theft as "unlawfully appropriating

16

property or unlawfully obtaining services as described by [specific referenced section of the] Penal

Code. § 134.002(2). Section 31.05 of the Texas Penal Code states

> A person commits an offense if, without the owner's effective consent, he knowingly:
>
> > (1) steals a trade secret;
> >
> > (2) makes a copy of an article representing a trade secret; or
> >
> > (3) communicates or transmits a trade secret.

TEX. PENAL CODE § 31.05(b). The term "article" is defined to include drawings. § 31.05(a)(1). And

a trade secret is defined as

> the whole or any part of any scientific or technical information, design, process, procedure, formula, or improvement that has value and that the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes.

§ 31.05(a)(4). "The statutory definition of trade secret comports with the definition used when tort

and contract trade secret law is considered." *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 472

(Tex.App.–Amarillo 2001, pet. denied).

For the reasons articulated above when analyzing Dresser-Rand's breach of confidentiality

agreement claim, the court finds that Dresser-Rand has met its burden to show that at least some of

the materials that Ashar and Jardine took were trade secrets. Therefore, Dresser-Rand has

demonstrated for this preliminary stage a likelihood of success on the merits against Ashar and

Jardine. However, Dresser-Rand has not shown that S&K possessed the correct mental state to be

culpable for theft as defined by § 31.05 of the Texas Penal Code, which requires that S&K have

acted knowingly. The Texas Penal Code states that

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with

knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

§ 6.03(b).  As discussed above, the evidence in the record at this point demonstrates that S&K had no knowledge that Ashar and Jardine possessed any materials from Dresser-Rand, much less trade secrets.  Therefore, Dresser-Rand has failed to meet its burden to demonstrate a likelihood of success on the merits on its claim against S&K under the Texas Theft Liability Act.

### 4.     Copyright Infringement Claim

The last cause of action upon which Dresser-Rand requests preliminary equitable relief is for Copyright Infringement, based on the similarity of S&K's OOTTV brochure with Dresser-Rand's Gimpel valve brochure.  The Copyright Act states that "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer.  17 U.S.C. § 501(a).  At the preliminary injunction hearing, S&K testified that it had taken the offending brochure off of its website and would not repost it.  Therefore, the court need not delve into the infringement inquiry and merely memorializes the representations of S&K in the court's order enjoining S&K from using the brochure.

## B.     Irreparable Harm/Balance of Hardships

Since the court has determined that, with the exception of the copyright infringement claims already covered by an agreed injunction, Dresser-Rand has failed to carry its burden to demonstrate a likelihood of success on the merits on its claims against S&K, the court examines the last three prongs of the injunction inquiry solely as to Ashar and Jardine.[5]  Additionally, since Dresser-Rand has carried its burden to show likelihood of success on the merits against Ashar and Jardine only as

---

[5] However, the court notes that should S&K be found liable for any of the claims against it, the courts have many different remedies at law that could adequately compensate Dresser-Rand for its damages.  *See Calco*, 166 Fed. App'x at 722–25 (listing various types of damages).

to (1) breach of confidentiality agreements, and (3) violations of the Texas Theft Liability Act, the court examines only the remedies available to Dresser-Rand pursuant to those causes of action.

Ashar and Jardine have agreed to return the materials and refrain from any future use of the materials.  Therefore, any injunctive remedy that might be available to Dresser-Rand under the breach of confidentiality agreement is already in place.  However, Dresser-Rand requests that the court go further and enjoin Ashar and Jardine from working on the S&K project.  In the context of misappropriation of trade secrets, the Fifth Circuit has upheld an injunction preventing an employee from working on a project for his new employer when the former employer demonstrated a likelihood that the employee had knowledge of trade secrets.  *See FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504–05 (5th Cir. 1982).  In *FMC*, the former employee was recruited by the new employer specifically because he had knowledge of a process that constituted the former employer's trade secret, and that the new employer had been unable to replicate.  *Id.* at 504.  The new employer put the employee in a position where he was likely to use those secrets but refused to require the employee to refrain from using those trade secrets.  *Id.* at 505.  Aside from the fact that *FMC* dealt with a misappropriation claim, *FMC* is also distinguishable on its facts.  In the instant case, unlike in *FMC*, S&K has instructed Ashar and Jardine not to make use of Dresser-Rand's trade secrets or confidential materials.  Also, unlike in *FMC*, there is no evidence in the record that S&K solicited Ashar and Jardine for the purpose of gaining Dresser-Rand's trade secrets.  And since Ashar is allowed to use the knowledge of valve engineering he has gained over 30 years of experience, *Anderson Chem. Co.*, 66 S.W.3d at 442, enjoining S&K from using that knowledge and experience is not equitable.  Moreover, the damages available under a breach of contract action and Texas Theft Liability Act violation are generally actual damages.  *Calco*, 166 F.App'x at 725; Tex. Civ. Prac. & Rem. Code § 134.005.  Dresser-Rand has not carried its burden to show that the measure of

damages it has suffered would be incalculable.  Accordingly, Dresser-Rand has an adequate remedy available to it at law.

Moving to the balance of harms, the harms to both S&K and Dresser-Rand are fairly evenly balanced.  Dresser-Rand has invested a great deal of time and money in the Gimpel OOTTV.  Thus, allowing further competition against it in a small market constitutes harm.  S&K has also invested time and money in its OOTTV and has contracts with Ellis for delivery of two of these valves.  At this point, the record demonstrates that S&K had no knowledge and did not participate in any alleged misappropriation of trade secrets.  Therefore, the harm to them if the court were to enjoin their work on the S&K OOTTV is great.  The harm to Ashar and Jardine is also great, depriving them of the ability to make a living doing what they are trained to do.  Dresser-Rand has met its burden to show that Ashar and Jardine took Dresser-Rand materials with them in violation of their agreements.  But, it has fallen short of demonstrating that Ashar and especially Jardine ever used materials that actually constitute trade secrets when developing S&K's valve.  Therefore, the harm to defendants is greater than the harm to Dresser-Rand, who can claim damages if it can prove at trial that its trade secrets were misappropriated.  Accordingly, Dresser-Rand has not met its burden to demonstrate that the balance of harms weighs in its favor sufficient to justify extending the injunction beyond that to which the parties have already agreed.

## C.    Public Policy

There is no question that public policy is served by enjoining Ashar and Jardine from using Dresser-Rand's materials, and S&K from using the allegedly infringing brochure.  However, the court is mindful that the "scope of injunctive relief is dictated by the extent of the violation established, and an injunction must be narrowly tailored to remedy the specific action necessitating the injunction."  *Fiber Sys. Int'l v. Roehrs*, 470 F.3d 1150, 1159 (5th Cir. 2006) (internal quotations

omitted).  Because Dresser-Rand has not met its burden to demonstrate actual use of an identifiable

trade secret or any knowledge on the part of S&K that Ashar and Jardine had Dresser-Rand

materials, enjoining Ashar and Jardine from pursuing their profession and S&K from carrying on

its business would not serve the public interest.  Accordingly, the injunction issued by this court is

as broad as merited by the record at this time.

CONCLUSION

Dresser-Rand came before the court on its motion for a preliminary injunction bearing a

heavy burden to show that equitable relief was merited.  After reviewing the filings and oral

argument of the parties, the evidence in the record, and the applicable law, the court finds that

injunctive relief should issue as outlined in the court's order of January 30, 2012.  Dkt. 9.  However,

any further injunctive relief is not currently supported by the record.

Signed at Houston, Texas on February 13, 2012.

_____
Gray H. Miller
United States District Judge