IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DRESSER-RAND COMPANY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:12-cv-184 |
| SCHUTTE & KOERTING | § | |
| ACQUISITION | | |
| COMPANY, KANAKSINH ASHAR, | § | |
| ANTHONY JARDINE, and DOES 1-5, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## S&K's MOTION TO EXCLUDE THE UNRELIABLE AND UNSUPPORTED EXPERT TESTIMONY OF DRESSER'S TECHNICAL EXPERT MEHERWAN P. BOYCE

Despite Defendants' numerous requests, Dresser has been allowed to avoid specifically identifying its alleged trade secrets since 2012. The Court finally recognized at a February 21, 2017 hearing "that this whole case hinges" on the expert report of Dresser's technical expert on its alleged trade secrets and even stated, "we'll be waiting for it."

Dresser's technical expert avoids specifically identifying alleged trade secrets and instead refers to "the theft of an entire business." More importantly, despite referring to "trade secret(s)" over 30 times in the report, the expert had not investigated even one of the six factors Texas courts require to prove a trade secret.

For this reason (and the other reasons explained herein), Dresser's expert report should be excluded.

# TABLE OF CONTENTS

**Page**

I. Nature and Stage of Proceedings.................................................................... 1

II. Statement of Issues to Be Ruled Upon and Standard of Review ................................... 3

III. Summary of the Argument.................................................................... 3

IV. Boyce's "Analysis" Is Inherently Unreliable and Should Be Excluded ........................ 6

    A. Boyce Lacks Any Factual or Legal Basis To Offer Reliable Testimony Related To Any Alleged Trade Secret ................................................................6

        1. Boyce Did Not Investigate Any of the Four Trade Secret Factors Related to Confidentiality (Factors 1-4)...........................................................7

        2. Boyce Did Not Offer Any Testimony Related to the Last Two Trade Secret Factors (Factors 5-6)...........................................................11

        3. Boyce Should Be Precluded from Testifying that Defendants Used Any Alleged Trade Secret Related to Nitriding, Copper, or Top Mechanical Trip Throttle Valve ...........................................................13

    B. Boyce's Opinions on Defendants' Knowledge, Intent, or State of Mind Are Irrelevant, Unreliable, and Inadmissible ...........................................14

    C. Boyce Confuses Trade Secrets and Copyright Issues ...............................16

V. Conclusion ...........................................................................16

HOU:3799803.1

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Astra Zeneca LP v. Tap Pharm. Products, Inc.,*
444 F. Supp. 2d 278 (D. Del. 2006) ................................................................12

*In re Bass,*
113 S.W.3d 735 (Tex. 2003) ...................................................................2, 6, 9, 13

*Bausch & Lomb, Inc. v. Alcon Laboratories, Inc.,*
79 F.Supp.2d 252 (W.D.N.Y. 2000) ...........................................................14

*C.P. Interests, Inc. v. California Pools, Inc.,*
238 F.3d 690 (5th Cir. 2001) .........................................................................13

*Cargill, Inc. v. Sears Petroleum & Transport Corp.,*
334 F.Supp.2d 197 (N.D.N.Y. 2004) ...........................................................14

*CDA of America Inc. v. Midland Life Insurance Co.,*
2006 WL 5349266 (S.D.Ohio Mar. 27, 2006) ...........................................14

*Daubert v. Merrell Dow Pharms, Inc.,*
509 U.S. 579 (1993) ...................................................................................2, 15

*Patriarch, Inc. v. Dynomite Distribution, Inc.,*
2007 WL 4800400 (C.D. Cal. Feb. 14, 2007) ............................................13

*Raytheon Co. v. Indigo Systems Corp.,*
598 F.Supp.2d 817 (E.D.Texas 2009) ..........................................................13

*Sanchez v. Boston Sci. Corp.,*
No. 2:12-CV-05762, 2014 WL 4851989 (S.D.W. Va. Sept. 29, 2014) .................12

*SEC v. Handgis,*
1995 WL 133769 (S.D.N.Y. Mar. 28, 1995) ...............................................12

*Skycam, Inc. v. Bennett,*
No. 09-CV-294-GKF-FHM, 2011 WL 2551188, at *5 (N.D. Okla. June 27,
2011) ..............................................................................................................13

*SL Montevideo Technology, Inc. v. Eaton Aerospace, L.L.C.,*
2005 WL 1923811 (D.Minn. Aug. 11, 2005) ..............................................14

HOU:3799803.1

*United States v. Izydore,*
    167 F.3d 213 (5th Cir. 1999) ................................................................................13

*United States v. Williams,*
    343 F.3d 423 (5th Cir. 2003) ................................................................................13

**Other Authorities**

Fed. R. Evid. 702 ................................................................................2, 12, 13, 15

Fed. R. Evid. 704 ................................................................................14

Fed. R. Evid. 704(a) ................................................................................13

HOU:3799803.1

## I.   <u>NATURE AND STAGE OF PROCEEDINGS</u>

At the outset, Judge Miller denied Dresser's request for a preliminary injunction since Dresser could not establish the requisite elements to prevail on, *inter alia*, a trade secret misappropriation claim for the OOTTV product at issue. (Dkt. 16).[1] In doing so Judge Miller found that S&K had a "design for an OOTTV that was active in the 1970's. It has many similarities to the present day Gimpel valve."[2] The Court also found that "It is an open question whether the historical documents [from Dressser's predecessors] qualify as trade secrets."[3]

Struggling to prove any specific trade secret when none of the documents at issue were even stamped "confidential"[4], Dresser initiated a criminal investigation by the U.S. government and then noticed depositions of the individuals being investigated. Judge Miller stayed the case in 2013 after S&K pointed out that Dresser was trying to force the individuals to assert their Fifth Amendment rights which would result in an adverse inference advantage for Dresser in the civil case.[5] The case re-opened in 2016 after the government declined Dresser's invitation to prosecute.

Since Plaintiffs initiated this action in 2012, Defendants have repeatedly asked the Court to require Dresser to specifically identify its alleged trade secrets instead of simply pointing to a pile of documents not stamped "confidential" that were allegedly

---

[1]   Dkt. 16 stating, "…Dresser-Rand has failed to carry its burden to demonstrate a likelihood of success on the merits on its claims against S&K."
[2]   Dkt. 16 at 6.
[3]   Dkt. 16 at 13.
[4]   Dresser's strict company policy required *all* documents containing trade secrets to be stamped "confidential." (Dkt. 66, Sealed Exhibit A, DR-688-690 Dresser policy entitled "Trade Secret Protection.").
[5]   Dkt. 68.

copied. This Court has long acknowledged that the law requires Dresser to identify its trade secrets at some point in the litigation. For example, in an August 16, 2012 hearing concerning Defendants' efforts to obtain a reasonably particular identification of Dresser's trade secrets, the Court made clear that Dresser would need to identify its trade secrets.  In an exchange with opposing counsel, Judge Johnson stated that [Defendants' lawyers] are "telling me [their] position that at some point, [Dresser] *is going to have to put [its] finger on what the trade secrets violations are*.  And I said *yes, I agree, at some point [Dresser will have to]*."[6]

Since that hearing and despite Defendants requests, Dresser has continued to avoid identifying its trade secrets with any specificity or reasonable particularity. However, Judge Johnson recently drew a line in the sand. In February of 2017, with expert reports looming, Judge Johnson specifically asked Dresser to confirm that "the documents that [Dresser] kept secret" were "all going to be contained in the expert report."[7]  Judge Johnson then warned Dresser "that this whole case hinges on that expert report" due in March 2017.[8]

Defendants recently took the expert's deposition on the March 2017 report on which "this whole case hinges." As explained in detail below, Defendants discovered that despite the expert report's reference to alleged "trade secret(s)" over 30 times, the expert had not investigated even one of the six factors required to prove a trade secret. In fact, the expert's testimony establishes that he wasn't charged with identifying the

---

[6]  Dkt. 86, Transcript of 8/16/12 Discovery Hearing at 13:21-24. (Emphasis added).
[7]  Dkt. 103, Transcript of 2/21/17 Discovery Hearing at 46:18-23.
[8]  Dkt. 103, Transcript of 2/21/17 Discovery Hearing at 51:3-5.

HOU:3799803.1

existence, or evaluating the validity, of any alleged trade secrets as Dresser led the Court to believe would be his task. Instead, he just assumed all information was somehow a trade secret. In other words, the report is irrelevant and unreliable because it still does not answer the "open question whether the historical documents [from Dressor's predecessors] qualify as trade secrets" as Judge Miller stated in denying Dresser's preliminary injunction at the outset of the case.

Moreover, the deposition of the expert revealed that there were many other problems in the report that make the proffered testimony unreliable and therefore inadmissible under any proper standard.

## II.    STATEMENT OF ISSUES TO BE RULED UPON AND STANDARD OF REVIEW

This Court knows well that expert testimony is only admissible if it is "the product of reliable principles and methods" and "the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. If the proffered expert testimony is unreliable, then it must be excluded. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993).

## III.    SUMMARY OF THE ARGUMENT

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it."[9] An analysis of whether something is a trade secret in Texas requires an analysis of the six Restatement factors.[10] As shown by

---

[9]    *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).

[10]    *Id.*

the exemplary admissions below, Dresser's expert did not investigate any of the required six factors.

| Trade Secret Factors 1-6 per *In Re Bass* | Exemplary Deposition Testimony Proving Expert's Failure to Apply Each Factor |
|---|---|
| 1. The extent to which the information was known outside of the business | "…what I wanted to ask you is what you did to investigate whether any of the alleged trade secrets that are in your report are known to anyone else outside of Dresser. Did you undertake any investigation to look into that?<br><br>No…."[11] |
| 2. the extent to which it was known by employees and others involved in the business | "And as part of your work in this case, did you investigate which Dresser employees had access to the alleged trade secrets that are listed in your report?<br><br>No I didn't…"[12] |
| 3. the extent of measures taken to guard the secrecy of the information | "And so your—an assumption upon which your report is based is that the confidential information that you were presented was confidential. That was your assumption?<br><br>Yes…"[13]<br><br>"…as part of your investigation here you didn't look into what Gimpel did specifically [with respect to treating drawings confidential], right? That wasn't part of the scope of what you reviewed?<br><br>No, I didn't particularly look into that."[14]<br><br>"You didn't do any specific investigation into what Dresser had done?<br><br>No…"[15] |

---

[11]   Ex. 1, Boyce Dep. 29:9-30:2.
[12]   Ex. 1, Boyce Dep. 31:3-6.
[13]   Ex. 1, Boyce Dep. 29:9-30:2.
[14]   Ex. 1, Boyce Dep. 69:4-8.
[15]   Ex. 1, Boyce Dep. 29:21-30:2.

HOU:3799803.1

| | |
|---|---|
| 4. the value of the information [from not being known to others] | "…what I wanted to ask you is what you did to investigate whether any of the alleged trade secrets that are in your report are known to anyone else outside of Dresser. Did you undertake any investigation to look into that?<br><br>No…."[16] |
| 5. the amount of effort or money expended in developing the information | "With respect to those programs and spreadsheets, you didn't investigate who created them or how they were created or how long it took to create them? I didn't see that in your report.<br><br>No."[17] |
| 6. the ease or difficulty with which the information could be properly acquired or duplicated by others | "Did you look at the evolution of the oil-operated throttle trip valve at Gimpel, and how it has changed, as part of your study in this case?<br><br>No, I didn't."[18]<br><br>"Have you ever seen an EBARA oil-operated throttle trip valve?<br><br>No.<br><br>So you don't know whether an EBARA oil-operated throttle trip valve is the same or different from a Gimpel oil-operated valve?<br><br>No, but -- there is only that much difference you can put in it."[19] |

As a matter of law this Court should disqualify Boyce from opining about or discussing any alleged "trade secret" in this case. He simply has not conducted any reasonable, proper, or reliable investigation.

---

[16]   Ex. 1, Boyce Dep. 29:9-30:2.
[17]   Ex. 1, Boyce Dep. 50:13-17.
[18]   Ex. 1, Boyce Dep. 34:11-14.
[19]   Ex. 1, Boyce Dep. 36:6-14.

HOU:3799803.1

## IV.  BOYCE'S "ANALYSIS" IS INHERENTLY UNRELIABLE AND SHOULD BE EXCLUDED

Boyce's report purports to relate to trade secret misappropriation but is instead titled "**Theft** Of Dresser–Rand's Gimpel® Mechanical And Oil Operated Trip And Throttle Valves By Schutte & Koerting Acquisition Company, Kanaksinh Ashar, Anthony Jardine, and Robert Maxwell".[20] The report spends a full page outlining the confidentiality and other legal requirements for information to be a trade secret.[21] However, as explained in detail below, Boyce ignored the very requirements he listed and did not undertake any analysis (technical or otherwise) of whether the information referred to throughout the report as a trade secret meets even one of the six required trade secret factors.

For example, Boyce provides his subjective interpretation of emails and other evidence to speculate wildly about Defendants' motivations and state of mind, e.g., "S&K attempted to cripple Dresser-Rand".[22] Of course, an engineering expert who is not a psychologist is not qualified to offer such opinions. And a technical expert should not be using inflammatory and speculative language like "theft", "steal", "stole", and "illegal" which appear at least 49 times in the Boyce report.[23]

### A.  Boyce Lacks Any Factual or Legal Basis To Offer Reliable Testimony Related To Any Alleged Trade Secret

Any testimony that a technical expert is allowed to provide in this trade secret misappropriation case should include analyzing the available evidence and applying

---

[20]  Ex. 2, Boyce March 2017 Report.
[21]  Ex. 2, Boyce March 2017 Report, pp.15-16.
[22]  Ex. 2, Boyce March 2017 Report, p. 43.
[23]  Ex. 2, Boyce March 2017 Report, *passim e.g.,* pp. 28, 36, 37, 47, 52.

the proper factors in determining whether specific information could be a trade secret.

Tellingly, Boyce did not even understand that role:

> Q: And what was your understanding of your task when you were hired for this case?

> A: Well, the understanding of the task was to look at whether these—what the defendants had done and whether—what my concept and ideas were of what the defendants had done, and **to give my opinion of whether these things were outside the practice of engineering**.[24]

Of course, expert testimony focused on whether "what the defendants had done" is "outside the practice of engineering" is irrelevant, not useful, and unreliable. The Boyce report could/should be stricken on that basis alone. However, there are numerous other admissibility problems as evidenced by Boyce deposition admissions described below.

**1.     Boyce Did Not Investigate Any of the Four Trade Secret Factors Related to Confidentiality (Factors 1-4)**

As previously noted, whether a piece of information is a "trade secret" turns on the consideration of the six factors set out in *In re Bass*. The first four of these factors— (1) the extent to which the information was known outside of the business; (2) the extent to which it was known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; and (4) the value of the information [from not being known to others] —all directly relate to the question of secrecy. Yet, Boyce expressly testified repeatedly that he made no inquiry into these factors:

> Q: So you said earlier, I think, that you relied on your 50 years of experience in coming up with your opinions here, but I wanted to ask you is what you did to investigate whether any of the alleged trade secrets that

---

[24]     Ex. 1, Boyce Dep. 11:6-11.

are in your report are known to anyone else outside of Dresser. Did you undertake any investigation to look into that?

A: No. But I like working with companies like Oberhausen and all that. These were all held very tightly held by each of the companies.

Q: But you didn't do any specific investigation to look into what Dresser had done?

A: No, [and then explains unrelated work he has done for Dresser].[25]

Boyce also did not investigate which Dresser employees had access to the alleged trade secrets. Instead, he simply assumed that the information with which he was presented was kept confidential:

Q: And as part of your work in this case, did you investigate which Dresser employees had access to the alleged trade secrets that are listed in your report?

A: No I didn't. As I said, they have a separate team of consultants who will be presenting that report.[26]

Q: And so your—an assumption upon which your report is based is that the confidential information that you were presented was confidential. That was your assumption?

A: Yes. I mean, if I had been doing that work for Dresser, they would have asked me to sign a confidential agreement.[27]

Despite his testimony above recognizing the importance of confidentiality agreements, Boyce did not consider or investigate the practices of Dresser (or its Gimpel and Tyco predecessors') as to confidentiality contracts:

---

[25] Ex. 1, Boyce Dep. 29:9-30:2.

[26] Of course, Dresser's expert report deadline has passed and there was no such report by any consultant. Moreover, the unreliability of the instant testimony should not be excused even if Dresser's alleged consultants later put forth some confidentiality information. Such information is within Dresser's control and should not have been withheld from Defendants and its own technical expert.

[27] Ex. 1, Boyce Dep. 31:3-14.

Q: I said I've already asked you about Dresser-Rand, if you reviewed any of their contracts with their customers for these OOTTVs. You already answered that and said no, correct?

A: Uh-huh.

Q: I assume the same is true with Gimpel and Tyco. You didn't analyze any of their contracts with their customers?

A: No, but we are talking about—Tyco and all that, and Gimpel before Dresser-Rand took it over.

Q: Correct.

A: Once Dresser-Rand took it over, all of Dresser-Rand's contractual information would come into play.

Q: Right. And I just wanted to factually verify that you've not gone back and tried—well, you've not looked at any Tyco contracts or Gimpel contracts. Just haven't done that?

A: No, I haven't done that.[28]

Without conducting an analysis of Dresser and its predecessors confidentiality practices, procedures, and history, Boyce has no basis to testify that any of the information at issue was treated as confidential internally or externally, in theory or in practice.[29]

Boyce also failed to analyze evidence showing that some or all of the OOTTV information at issue was freely available in the public domain. The design of the

---

[28] Ex. 1, Boyce Dep. 104:20-105:13. *See also*, Boyce Dep. at 69:3-8.

[29] The analytical flaws which fatally infect Boyce's attempts to offer an expert opinion about Dresser's trade secrets are further exacerbated by the information which Boyce freely admits he did not consider even though the materials were available for him to review (since S&K produced them). For instance, even though the Gimpel valve is the subject of multiple expired patents—Boyce did not investigate how (if at all) the design of the OOTTV changed over time. (Ex. 1, Boyce Dep. at 34:11-14). Similarly, while Boyce parrots Dresser's allegation that S&K's "top mechanical valve" was designed using allegedly misappropriated Dresser trade secrets, Boyce did not even bother to check to see if S&K's "top mechanical valve" design changed after Ashar arrived at S&K with the allegedly misappropriated information. (*Id.* at 55:18-22).

HOU:3799803.1

OOTTV in question is based on a design that by Boyce's own admission has been sold since 1980.[30] The OOTTV product at issue is also the subject of S&K's expired patent from 1927 which S&K sold through the 1970's.[31]  However, Boyce did not investigate how (if at all) the design of the OOTTV changed over time:

> Q: Did you look at the evolution of the oil-operated throttle trip valve at Gimpel, and how it has changed, as part of your study in this case?
>
> A: No, I didn't.[32]

Of course, without examining the changes, if any, of the valve over time, Boyce has no way of identifying not only what changed, but also what aspects, if any, of the design differ from those that are publicly available and cannot as a matter of law be trade secret.

What's more, Boyce ignored or avoided analyzing available evidence that suggested that at least certain portions of the alleged trade secrets were not even owned by Dresser. For example, Boyce testified that the government (and not Gimpel) owns the design of the OOTTVs that Gimpel created for the government.[33] Of course, Dresser cannot assert that information owned by someone else is somehow their trade secret. Yet, Boyce's report offers nothing to parse which information is owned by Dresser and which may be owned by the government or someone else. This is yet another independent reason for excluding the proffered expert testimony.

---

[30]   Ex. 2, Boyce March 2017 Report, p. 10.
[31]   Dkt. 12, Transcript of 01/26/17 Temporary Injunction Hearing at 109:22-111:22.
[32]   Ex. 1, Boyce Dep. 34:11-14.
[33]   Ex. 1, Boyce Dep. 28:3-18.

Because Boyce wholly failed to conduct any investigation or analysis of confidentiality, he has no "special knowledge" that would qualify him as an expert witness on the subject. Boyce should not be permitted to testify about any matter relating to alleged trade secrets.

**2.    Boyce Did Not Offer Any Testimony Related to the Last Two Trade Secret Factors (Factors 5-6)**

Boyce's error in refusing to investigate the secrecy of Dresser's alleged "trade secrets" pollutes his ability to offer any reliable, supportable expert testimony regarding (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. In fact, his report wholly ignores these two factors leaving no evidence as to any of the six trade secret factors.

Factor (5) is "the amount of effort or money expended in developing the information." Boyce admitted ignoring this factor as to all the programs and spreadsheets in his report that are referred to as alleged trade secrets:

> "With respect to those programs and spreadsheets, you didn't investigate who created them or how they were created or how long it took to create them? I didn't see that in your report.
>
> No."[34]

With respect to any alleged OOTTV trade secrets Boyce admitted he had not even studied how the OOTTV product had changed since Gimpel made the product publicly available in 1980:

---

[34]    Ex. 1, Boyce Dep. 50:13-17.

HOU:3799803.1

"Did you look at the evolution of the oil-operated throttle trip valve at Gimpel, and how it has changed, as part of your study in this case?

No, I didn't."[35]

Of course, without analyzing how the 1980 OOTTV product was originally developed or had changed (if it had) one cannot reliably opine on "the amount of effort or money expended" in making any changes to the OOTTV product at issue. Thus, like Factors 1-4 there is no evidence (reliable or otherwise) on Factor 5 in the Boyce report.

Factor (6) is "the ease or difficulty with which the information could be properly acquired or duplicated by others". Of course, since Boyce admittedly did not analyze the confidentiality factors (1) to (4) of a trade secret, then Boyce (or anyone else for that matter) cannot opine how easy or difficult it is to reverse-engineer, i.e., duplicate, the OOTTV or any other alleged trade secret. That is, if one does not analyze what is publicly available to an engineer designing an OOTTV, then how can one know how easy (or difficult) it would be to duplicate the OOTTV?

What's more, Boyce admitted that there are not many differences in OOTTV designs - much more trade secrets within the designs. Specifically, Boyce was asked whether he had seen on of the competing designs and admitted there may not be many differences:

"Have you ever seen an EBARA oil-operated throttle trip valve?

No.

So you don't know whether an EBARA oil-operated throttle trip valve is the same or different from a Gimpel oil-operated valve?

---

[35]  Ex. 1, Boyce Dep. 34:11-14.

*No, but -- there is only that much difference you can put in it."*[36]

Boyce did not analyze even one of the six trade secret factors and the entirety of his testimony should be excluded for this reason alone. However, Boyce's deficient analysis is not limited to determining what is (or is not) a trade secret.

### 3. Boyce Should Be Precluded from Testifying that Defendants Used Any Alleged Trade Secret Related to Nitriding, Copper, or Top Mechanical Trip Throttle Valve

Boyce did not investigate what is (or is not) a trade secret as described in detail above. However, Boyce opines that the "Procedure for Nitriding ASTM–A193 GR B7 (A322 GR 4140) ("EDS017") were copied from Gimpel® procedures."[37] Showing his total lack of investigation Boyce was forced to admit that "nitriding itself is not a trade secret"[38] and that he "does not know the specifics of what S&K does as far as nitriding on any of its valves."[39]

Along the same lines, in his report Boyce opines that Defendants misappropriated the idea of using copper for top mechanical valves as it "relieves 90% of the high torque and galling issues".[40] In his deposition, Boyce was forced to admit that it is "not a trade secret to use copper for a top mechanical valve"[41] and that he did not investigate "whether S&K was using copper on any of its top mechanical valves before [the first ex-Dresser employee] Ashar arrived."[42] This is illuminating as to the irrelevance of so many statements in Boyce's report not the least of which have to do

---

[36] Ex. 1, Boyce Dep. 36:6-14 (emphasis added).
[37] Ex. 2, Boyce March 2017 Report, p. 44.
[38] Ex. 1, Boyce Dep. 52:5-13.
[39] Ex. 1, Boyce Dep. 53:9-12.
[40] Ex. 2, Boyce March 2017 Report, p. 32.
[41] Ex. 1, Boyce Dep. 51:19-22.
[42] Ex. 1, Boyce Dep. 52:5-7.

with S&K's "top mechanical" valve design that has undisputedly been the same design since the 1960s—well before hiring any of the ex-Dresser employees.[43]

The Boyce report alleges S&K's trade secret misappropriation includes the "top mechanical" valve design (TMTTV) stating "S&K's TMTTV line was altered…."[44] However, Boyce admitted that he "didn't check" whether "the S&K design for the top mechanical" changed.[45] Thus, any Boyce testimony on the top mechanical valve, nitriding, or copper should be excluded as unreliable.

## B. Boyce's Opinions on Defendants' Knowledge, Intent, or State of Mind Are Irrelevant, Unreliable, and Inadmissible

Technical expert Boyce ignores the six trade secret factors in his report and instead offers his subjective interpretation of Defendants' psychological goals and states of mind. For example, Boyce writes:

> "To meet such an aggressive time schedule, Mr. Ashar was planning on using the data that he was going to remove from Dresser-Rand. He *believed* that since he developed the valve, the newly developed valve was his, regardless of any contract he may have been asked to sign. Table I shows the movement of personnel between the three corporations, *a clear attempt by S&K to attack the newly formed Dresser-Rand Gimpel division by convincing him to move to S&K with all of Dresser-Rand's proprietary information on the OOTTV by playing on his concept that he owned the entire design of the OOTTV.* "[46]

> The addition of Dresser–Rand employees to the S&K group of engineers *was intended* to add a major level of expertise to the S&K engineering team. The Dresser–Rand team had incomparable experience related to the Gimpel® trip and throttle valves. By first hiring Mr. Ashar and then getting him to bring in the heads of the various sub-departments— Mr. Maxwell (Design Engineer) and Mr. Jardine (Product

---

[43] Ex. 3, S&K's Second Supplemental Answers to Dresser-Rand's Interrogatories at Rog 10 (p. 4).
[44] Ex. 2, Boyce March 2017 Report, p. 36.
[45] Ex. 1, Boyce Dep. 55:18-22.
[46] Ex. 2, Boyce March 2017 Report, pp.14-15.

HOU:3799803.1

Specialist/Designer)—S&K *attempted to cripple* Dresser–Rand's valve department.[47]

The above quotes are but a few examples of instances in which Boyce offers his subjective view on morality and the Defendants' state of mind. Indeed, Boyce devotes an entire section of his report—"Historical Events"—to providing his own interpretation of ethics as related to this lawsuit.[48] He then speculates wildly on morality stating "what [the Individual Defendants] did was wrong" "in the opinion of most people in this country."[49]

Boyce's commentary on Defendants' intent or state of mind is impermissible. Boyce is not a psychologist and not qualified to offer opinion testimony regarding Defendants' state of mind. All of his testimony on state of mind should be excluded. *See e.g. Sanchez v. Boston Sci. Corp.*, No. 2:12-CV-05762, 2014 WL 4851989, at *10, 30 (S.D.W. Va. Sept. 29, 2014) ("expert opinions on BSC's knowledge or state of mind are not helpful to the jury. *See* Fed.R.Evid. 702. Therefore, these opinions are excluded."); *Astra Zeneca LP v. Tap Pharm. Products, Inc.*, 444 F. Supp. 2d 278, 293 (D. Del. 2006) (holding that experts are not permitted to testify regarding intent, motive, state of mind, or evidence by which state of mind may be inferred.); *SEC v. Handgis*, 1995 WL 133769, at *1 (S.D.N.Y. Mar. 28, 1995) (testimony as to another's state of mind "seems more suited to the mind-reader's booth on a carnival midway than to the witness box in a courtroom.").

---

[47] Ex. 2, Boyce March 2017 Report, p. 28.
[48] Ex. 2, Boyce March 2017 Report, pp. 29-34.
[49] Ex. 1, Boyce Dep. 90:7-11.

HOU:3799803.1

### C. Boyce Confuses Trade Secrets and Copyright Issues

As described above, Boyce did not conduct any appropriate trade secret investigation. Instead, Boyce appears to be complaining about copyright issues. That is, Boyce repeatedly refers to Defendants alleged **copying**[50], "**plagiarized** Maintenance and Operating instructions"[51], and "**plagiarized** Valve Piping Recommendations, Recommended Preventative Maintenance Instructions, and Blowdown Kit Installation Instructions".[52] Boyce should not be allowed to testify about alleged copying and plagiarism which is clearly a copyright issue and suggest there is some sort of trade secret. That is contrary to law, confusing for the jury, and prejudicial.

## V. CONCLUSION

Notwithstanding Dresser's repeated promises to the Court, the expert report fails to present reliable information to identify the existence of any trade secrets. Unable to opine on the existence, or validity, of any specific trade secrets, the expert, rather, opines about "what the Defendants had done". As explained above, those opinions are irrelevant, not useful and unreliable. Consequently, Boyce's report is unreliable and should be excluded.

---

[50] Ex. 2, Boyce March 2017 Report, pp. 25, 26, 27, 42, 44, 45, 46, 48, 52, 53.
[51] Ex. 2, Boyce March 2017 Report, p. 45.
[52] Ex. 2, Boyce March 2017 Report, p. 47.

HOU:3799803.1

Respectfully submitted,
**ANDREWS KURTH KENYON LLP**

By: _s/ Gregory L. Porter_
    Gregory L. Porter
    State Bar No. 24002784
    Federal I.D. No. 34185
    600 Travis, Suite 4200
    Houston, Texas 77002
    713-220-4621
    713-220-4285 (Fax)
    gregporter@andrewskurth.com

    ATTORNEY-IN-CHARGE FOR DEFENDANT
    SCHUTTE & KOERTING ACQUISITION
    COMPANY

OF COUNSEL:

Eric G. Osborne
State Bar No. 24088165
Federal ID No. 2109359
Joseph W. Golinkin II
State Bar No. 24087596
Federal I.D. No. 2515657
Connell C. Hess
State Bar No. 24101908
Federal ID No. 3061860
Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, Texas 77002
713-220-4200
713-238-4285 (Fax)
ericosborne@andrewskurth.com
jebgolinkin@andrewskurth.com

Daniel R. Utain
Kaplin Stewart Meloff Reiter & Stein, P.C.
P.O. Box 3037
Blue Bell, Pennsylvania 19422
610-941-2582
610-684-2032 (Fax)
dutain@kaplaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of June, 2017. I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which constitutes service of the document on all the attorneys of record who are filing users registered as filing users of the system.

*s/Joseph W. Golinkin II*
Joseph W. Golinkin II

HOU:3799803.1